And the court will proceed to the fifth case, Stanley Hutchison v. Fitzgerald Equipment Company. Mr. Scanlon. May it please the court, my name is Edmund Scanlon and I represent the plaintiff, Stanley Hutchison. On August 19th of 2013, Stanley Hutchison was a truck driver employed by Berkholder. And he was making a delivery from Berkholder's Indiana facility in Napanee, Indiana to their facility in Metamora, Illinois, outside of Peoria. While he was waiting for the forklift driver at Berkholder's Metamora facility to unload material from his truck, the forklift, in the process of doing it, its right tire ran over his left leg, severely and permanently injuring it. This case is here before you on the district court's dismissal pursuant to Rule 56 of Count 2 of the Second Amended Complaint, which essentially was a duty to warn, basically under two separate theories, an unequal knowledge and a voluntary undertaking. And it's also here on the court's dismissal under Rule 12b-6 of Count 1. I believe that actually was the First Amended Complaint, but it traveled over into the Second Amended because it was amended with no changes. So the order stayed the same, but they dismissed it as pleadings. I'm going to start my argument with Count 2, which deals with the duty to warn. And essentially, as I've laid out in my brief, and I'm not going to try to recite every case and argument I made in the brief, it's rather self-explanatory. But with respect to the duty to warn, on the unequal knowledge, that's the first portion. And the second portion, I'll argue, is on the voluntary undertaking. Now, Happel v. Walmart is the Illinois Supreme Court lead case on unequal knowledge, and it identifies four factors that set forth a duty. One is the reasonable foreseeability. I think it's reasonably foreseeable that an injury might occur, particularly at a facility where they only have one forklift operating at a time. So the arguments against having alarms on forklifts don't really apply because it's not like a loading dock where you have 50 docks and they're beeping all day and it doesn't alert anybody to anything and everybody just disregards them all. This Fitzgerald knew as a service and dealer of forklifts. Mr. Scanlon, I think the point that concerns me, those arguments would resonate more with me, or they seem stronger to me, if you're talking about Borkholder. So can you, as you're making those arguments and articulating your points, how is it that they extend here to, what's their name, Fitzgerald?  Fitzgerald, that was a servicer and did maintenance work, right, on the forklifts? Yeah, they had a 90-day service arrangement with Borkholder. So they come out every 90 days, look at their forklifts. They had two forklifts, one a Caterpillar, which is a subject of this lawsuit. The concern I have is that it's basically a duty to inspect. There's probably all kinds of different safety features and other bells and whistles that may not be on a particular forklift. But when their obligation is to lubricate the machine and keep an eye on the tires and what have you, what source of law, what's your best authority that they need to go further than that? Well, I think what we're doing here, and I think it's what the district court did, is conflate the duty under a contractual arrangement, which they did have a contractual arrangement. They brought them there every day with the voluntary undertaking. Now, Travis Cowley, who was the general manager of Fitzgerald, and Patrick Boyer, who's the technician for Fitzgerald, both have testified in this case that if in doing their inspections, they had an in-house custom to make a recommendation to their customers to install a forklift if they observed, I mean, a backup alarm, if they saw a backup alarm on one of the forklifts they were servicing that was inoperative. They also said, we have an internal policy to recommend to our customers that if other vehicles at their facility had backup alarms on them, and one of their forklifts did not have a backup alarm, that they would recommend the installation of a backup alarm. The reason that becomes important is because Roger Nenney, who was the general manager of Burkholder, and Chad Shire, who was the operator of the forklift that actually ran over Stanley Hutchinson, both relied on Fitzgerald to make recommendations. So they actually supplanted Burkholder's duty, is what we've argued in our brief, and which I'm arguing here. But what special knowledge did Fitzgerald have about the need for these alarms, these backup alarms, that Burkholder did not have? I think we really need to zero in on that. Well, I think probably the simplest argument is that backup alarms, the reason that there are no industry standards, and I set forth in my brief the reasons why industry standards and statutes, etc., are not dispositive. They can be considered both as evidence of negligence or evidence of freedom from negligence. But they're not dispositive, necessarily. And the reason that is so is because, as I pointed out earlier, when you have loading docks where customarily forklift operators are constantly moving, if they all had backup alarms on them, then in the dock next, you don't know whose backup alarm it is, and they become meaningless. This is not something that a two forklift lumberyard with about 10 employees has any knowledge of. They have no knowledge why it's not required, why it's not a statute, or why OSHA doesn't require it, and they don't, the reasons I mentioned. But that doesn't mean that Fitzgerald, as a seller, servicer of forklifts to both small facilities like Burkholder's Metamora facility and to large facilities like a trucking concern, doesn't know this. They do, and they should, and they should communicate that knowledge to a customer of theirs that is relying on them to make recommendations as to how best to safely operate their forklifts. Both Roger and... So do you think Fitzgerald could have added a piece of equipment, for instance, to one of Burkholder's forklifts without Burkholder's permission? No, but I think it's instructive to note that the service technicians for Fitzgerald carry backup alarms in their service vans. Remembering, Fitzgerald is coming out to Burkholder's Metamora facility. So they're like, in the Happel case, they talk about Walmart having patient-specific information regarding the uses of medication. Precisely the same situation we have here is that Fitzgerald, because they have observed the facility at Burkholder's Metamora facility in operation, knows that there's only one forklift ever being operated at a time. And so there's the arguments against installing and recommending the installation of a backup alarm are not present, and that should have been communicated. Plus, there's a factual dispute that the district court apparently ruled as a matter of law. The forklift truck driver initially said in his deposition that there was an inoperative backup alarm on the forklift on the day of the accident. It was subsequent in cross-examination that he waffled. But then he went back to say, well, I saw wires where backup alarms were present, and I know that there was a backup alarm on that caterpillar prior to this incident. And if there was, and it was inoperative, it should have been brought to the attention of Fitzgerald, to Burkholder management, because they relied on them to make these recommendations. Yeah, but if a maintenance worker at Fitzgerald made a one-time recommendation to Burkholder to buy a backup alarm, is the company forever bound to have that duty? No, but there's no evidence that they ever made the recommendation. And that's the issue here. They don't have to make it again and again and again and again. You know, the defendant cites Barone, which is a company that's come in inspecting a bank for a faulty carpet. The distinction with Barone, in addition to, as I pointed out, relied on an Illinois appellate court decision interpreting section 323 of the restatement, and we're dealing with 324A here in this case. But in addition to that, Barone dealt with the situation where the company did alert the bank that there was a problem with their rug, but they never repaired it. And it turned out that this company was not in the business of repairing it. Here, there was no recommendation that there's something amiss, it's not really safe to be operating a forklift in this situation at this facility. And they never communicated that ever to Fitzgerald, that they should have installed a backup alarm on there. But as I pointed out earlier, there's a discrepancy here about actually whether there was or wasn't a backup alarm on it the day of the accident. The plaintiff was clear at the beginning, and then he got concerned in cross-examination, and he kind of backtracked a little bit. But he did still go back and says, I know there was one there at one time while I worked there, and this is all during the time frame that Fitzgerald is providing service from 2000 up to the 2013 incident. Just going on just briefly into the reliance issue. Under the voluntary undertaking, under 324A, the failure to exercise due care increases the risk. There's no question here that plaintiff has evidence that it increased the risk of harm. Both the plaintiff himself, the forklift operator, as well as plaintiff's engineering expert have all testified that if it had a backup alarm, this accident likely, and more likely than not, would never have occurred. And second criteria under 324A is that you're undertaking your duty to perform a duty owed by another. It's clear OSHA mandates that Burkholder has the obligation to inspect and make sure their forklifts are operating correctly and that they're in good repair. But this was supplanted by Fitzgerald. They washed their hands of it and said, they're the ones that are the experts in these things. They repair, they service, we buy everything else through them, and as a result, they supplanted the duty. Finally, the third one is that the harm is suffered by reliance. The district court goes on and says, in an opinion dismissing the action, they say there's no evidence that he, meaning Stanley Hutchinson, relied on Fitzgerald to make this recommendation. Well, in Wilkulich, and in Scott v. Spetzer, the Illinois Supreme Court said in Scott v. Spetzer, it dealt with wards. The same identical issue is that wards hired somebody to do some work for them, and it wasn't done correctly. Well, tenants of the ward didn't know that the contractor wasn't doing their work, but they held it was enough that a third party who hired the people relied on them to do this, that that reliance is sufficient. And Illinois Supreme Court has been clear on that. Under Wilkulich, the same thing is clear. There's no question this case is pending here pursuant to Illinois law, which is the governing law in this case. And Wilkulich also, they've set that out in the brief, is very clear on that issue, that reliance of the plaintiff himself is unnecessary. And just briefly, under in concert liability, I believe that the district court has ruled as a matter of law that the allegations that plaintiff has do not amount to substantial assistance. I find it a little bit, they make the argument that failure to act cannot be substantial assistance. There's no cases in Illinois that say a failure to act. Indeed, there are cases in Illinois. Wilkulich is the one, the lead one. That's where the guy, his daughter or son had an underage drinking party in their home, and one of the girls passed out underage from drinking too much alcohol. The family took control of the girl, didn't contact her family, and they didn't call the ambulance or anything. And she ultimately died. The family sued her, and the argument was, well, they didn't do anything. That's nonfeasance. Therefore, you'd have to, the court said by undertaking to act, defendants became subject to a duty with respect to the manner of performance. And they said that's misfeasance, which again goes back to the reliance issue, that it doesn't require reliance by the plaintiff personally. Mr. Scanlon, I just want to point out the time situation. I don't want to cut you off. You may make a concluding remark. And though your time has expired, I will give you two minutes of rebuttal. Fine, I'll take the rebuttal at this point. I've basically finished my points, Your Honor. Okay, thank you, Mr. Scanlon. Mr. Lyon. May it please the court, Bruce Lyon on behalf of the defendant, Apollee Fitzgerald. This case boils down to simply the lack of duty. The plaintiff has never established that Fitzgerald has a duty in this situation. Fitzgerald is a service company who periodically goes out and greases and changes oil on equipment at Borkholder. Fitzgerald is not a manufacturer of forklifts. Fitzgerald has a limited contract. The law is very clear that as to that contract, that defines the responsibilities. At this point in time, it appears as if plaintiff is conceding the fact that there is no duty under the contract. Plaintiff's sole argument goes to this voluntary undertaking. And what's important to note is that the case law has been very clear as to service companies. If you look at Baroni and Kurtz, these are service companies. And in those cases, they have found no duty. What the plaintiff is asking this court to do is place an obligation on a service company to warn of a potential that isn't even required and isn't necessarily helpful. The plaintiff's own expert in the case has testified that in some occasions, backup alarms can be helpful. In some places, they are not. Twice a year, the record shows, is about how often Fitzgerald gets out there. Plaintiff is attempting to argue that Fitzgerald has taken on the role that OSHA places upon Borkholder. Borkholder is required to inspect that forklift every single day. Fitzgerald had not been to this facility for six weeks. Clearly, Borkholder is the one who has the responsibility to inspect their forklift. Now, what the plaintiff is asking is for you to change Illinois law. Because the Illinois law relative to service companies is that in situations similar to this, the courts have consistently found no duty. To give you an example, what the plaintiff is asking is, I bring my car to a gas station and ask them to change the oil. They take a look at it and they say, hey, you know, you're a windshield wiper. There's a streak there. And I say, you know, okay, that's nice. You know, just change the oil. Do they have a duty, okay, cars now are manufactured, you can purchase them that have lights that come on if a car comes up on your side. Do they have a duty to say, hey, wait a second, hey, I've got to put this on. You can't take this vehicle away until I put the side protection on, because it's possible that that might help you. No, that's not the obligation of a service provider. If counsel had wanted to go after whether or not backup alarms should be mandatory, he should have sued Caterpillar. They haven't sued the manufacturer in this case. The evidence is clear here that it is unknown whether in this particular case what a backup alarm would or wouldn't have done. But what is very clear is that manufacturers all over this country are manufacturing forklifts with and without backup alarms. Now, in terms of the facts, a couple facts I want to highlight. In terms of this particular forklift, the evidence shows that it was manufactured without a backup alarm. The evidence showed that a different service company, showing that Fitzgerald wasn't the only service company that came out to this facility, after the accident, put a backup alarm on this forklift. In the affidavit from the provider who did this, he indicated there was no backup alarm on this. In fact, Chad Shearer, the individual who backed into Mr. Hutchison, he testified that in working at Photographs, taking the day after the accident, there was no backup alarm. It is uncontroverted that there was no backup alarm. Fitzgerald did not manufacture it. Fitzgerald did not sell this. In terms of voluntary undertaking, defendant is trying to equate an internal business practice with a voluntary undertaking. When you take your car to Jiffy Lube, they look at things. They haven't voluntarily undertaken a responsibility. They have a business practice of trying to sell additional things when you go get your oil changed. That is not a duty that goes to the plaintiff or to a third party. In this case, even if there was a volunteer undertaking, there would be no violation. As I've already said, there's no requirement for backup alarms. Clearly, Borkholder is the one, as Your Honors asked counsel, they are the ones who have this obligation, not Fitzgerald. Now, again, Kurtz and Barone, I think, are the two service cases that are applicable. In terms of the Happel case that this plaintiff cites, a very, very different set of facts. Here you have a pharmacy who is getting information, specifically requesting information from a plaintiff concerning other medications they're taking and their background and such. Because of the pharmacy's background, the special circumstances, as the court saw, they are permitting them, they are saying, okay, here we see that there is a duty, and they specifically say it is very limited and there are special circumstances. None of those circumstances exist in this case. In terms of the unequal knowledge, this is another key factor, in that there was not unequal knowledge. In fact, the people who knew what Borkholder did at their operation is Borkholder. Borkholder purchases machinery, Borkholder runs their operations. How they do it, when they do it, that is all information that Borkholder has. It's not information that someone who comes twice a year to change oil has. Clearly, there is no unequal knowledge. Very dissimilar from a plaintiff who knows nothing about prescription medication and a pharmacist versus simply a service company. In terms of in concert liability, I think a perusal of the cases shows you what in concert liability is. In concert liability tends to be in situations where someone is intoxicated, they get in the car, and they tell someone to drive fast, go through the stop signs, drag race. Those are the type of situations where they are actively encouraging a joint enterprise. The case of the boat, where the one occupant is giving alcohol and cocaine to the driver and encouraging them, that is an in concert. They are doing something together, and you have someone substantially assisting. The two cases involving Winters and Forte, where you have basically two vehicles on the roadway. You've got an oversized vehicle and a lead vehicle, and they are working in tandem, working together, and if they're giving false information, then they have something they are doing together, and the front vehicle is substantially assisting. That simply is not the case in this situation. Again, the plaintiff's argument is really directed at the manufacturers of forklifts here, and not at Fitzgerald. For all these reasons, we believe that the district court's ruling should be affirmed. If you have any questions, I'm happy to ask them. Thank you very much. Mr. Scanlon, you may have two minutes for rebuttal. Okay. With respect to the voluntary undertaking that counsel represented or discussed, first of all, if we look at the case of Wakulish, he says that Fitzgerald doesn't have an obligation here, because they're not there every day. They're not day-to-day operating this. They only come out, although they have a 90-day service agreement. He says they come out a couple of times a year. I'm not going to argue that. I'm not sure it makes any difference in the analysis. But what we have here, if you look at the Wakulish case, the father, who took control of this intoxicated young girl and put her in a special room in their home, presumably to let her sleep it off, without calling her parents or without calling for assistance, he had no duty to do that. He could have done nothing. But he chose to do that. And the Illinois Supreme Court said, wait, wait a second. If you're going to do this, if you're going to take this effort to take this girl into custody, deprive her of having her parents be involved to make a decision about how they best want to care for their daughter, or don't call for assistance with an ambulance, we're saying you are responsible. Here, what we have is Fitzgerald. They come out. They tell the general manager of Burkholder's Metamora facility, hey, we're your guys. We're going to come out. We're going to tell you everything you need to have done to this to make sure these things are operating safely. That's what Boyer and Travis Conley admitted to. They said, yeah, that we agreed to do that, to make safety recommendations regarding this. They didn't have to do this, but this was what they agreed. This is what they voluntarily undertook to do, and both the general manager of Burkholder and the forklift operator both relied on Fitzgerald to do this. It's quite the same thing as in Likulich. The court there said the girl is essentially relying on the father, her friend, to take care of her. And I'm suggesting here, and arguing here, that that's the situation we have here. As to Happel, I'm just going to say that special circumstances exist, as they did in Happel, by virtue of the fact that Fitzgerald saw the special circumstances that were going on at this Burkholder's Metamora facility with one forklift operating at a time, and therefore they had a duty to transmit their knowledge that in those circumstances a backup alarm is necessary. Thank you. Thank you. Mr. Scanlon. Thank you, Mr. Lyon. The case is taken under advisement. The court will proceed to the signature.